**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

**Case No.:__________________**

ROBBIN ZEIGLER, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

ARIETIS HEALTH LLC, a Florida limited liability company,

Defendant.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................ i

NATURE OF THE ACTION ..........................................................................1

THE PARTIES ..............................................................................................4

JURISDICTION AND VENUE ......................................................................5

COUNT I
Violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.* ...............7

COUNT II
Negligence...................................................................................................28

COUNT III
Breach of Third Party Beneficiary Contract ...........................................................54

COUNT IV
Quasi-Contract/Unjust Enrichment.............................................................73

PRAYER FOR RELIEF ...............................................................................94

DEMAND FOR JURY TRIAL ......................................................................95

Plaintiff ROBBIN ZEIGLER ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant ARIETIS HEALTH LLC ("Arietis" or "Defendant"), based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys.

## NATURE OF THE ACTION

1. Defendant Arietis is a revenue cycle management ("RCM") provider for healthcare providers in the states of Florida, North Carolina, and elsewhere. RCM is a financial process used by healthcare providers to track patient care milestones such as registration, appointment scheduling, and payment. RCM providers such as Arietis use medical billing software to itemize and categorize the services and treatments patients receive at healthcare providers and then submit that information to health insurance carriers in a manner that leads to the payment of claims.

2. As a necessary part of this process, Arietis collects, aggregates, stores and transfers large amounts of sensitive patient Personal Identifying Information ("PII") and Protected Health Information ("PHI"). The PII/PHI collected by Arietis includes, *inter alia*, those patients' names, addresses, dates of birth, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, provider names, social security numbers, driver's license

numbers and potentially payment information. These patients reasonably expect that their PII/PHI, when given to RCM providers such as Arietis, will be protected and safeguarded from unauthorized third-party access by those RCM providers.

3. On or around May 31, 2023, Arietis was alerted to a critical vulnerability affecting the MOVEit software it used to transfer patient PII/PHI. Arietis then took steps to investigate its own data environment, which revealed that unauthorized third-party hackers had accessed and acquired patient PII/PHI from its data server on that same day (the "Data Breach"). This Data Breach affected at least 1,975,066 of Arietis' patients.[1]

4. Under statute and regulation, Arietis had a duty to implement reasonable, adequate industry-standard data security policies safeguards to protect patient PII and PHI, including and especially when providing access to that PII/PHI to third-party agents and vendors such as MOVEit. Arietis acknowledges these duties in, *inter alia*, its public-facing website, wherein it states that "[w]e are tested for all aspects of data security and compliance," and that "[w]e are committed to being your trusted healthcare partner. We take extreme measures to provide you with the highest quality compliance, data security and revenue integrity program."[2] That same webpage also touts that Arietis is "HIPAA complaint" and that it is in "100%

---

[1] *Cases Currently Under Investigation*, U.S. Department of Health and Human Services, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed October 19, 2023).
[2] "About" https://www.arietishealth.com/company/about/ (last accessed October 19, 2023).

compliance with Annual HIPPA [*sic*] training." Despite this, Arietis failed to meet these duties and failed to implement such reasonable and adequate safeguards.

5. Plaintiff, individually and on behalf of those similarly situated persons (hereafter "Class Members"), brings this Class Action to secure redress against Arietis for its reckless and negligent violation of their privacy rights. Plaintiff and Class Members are patients and former patients of healthcare providers that utilized Arietis' services who had their PII and PHI collected, stored and ultimately breached by Arietis.

6. Plaintiff and Class Members have suffered injuries and damages. As a result of Arietis' wrongful actions and inactions, Plaintiff and Class Members' PII and PHI have all been compromised. Plaintiff and Class Members have had their privacy rights violated and are now exposed to a heightened risk of identity theft and credit fraud for the remainder of their lifetimes. Plaintiff and Class Members must now spend time and money on prophylactic measures, such as increased monitoring of their personal and financial accounts and the purchase of credit monitoring services, to protect themselves from future loss. Plaintiff and Class Members have also lost the value of their PII and PHI, along with the benefit of their bargains.

7. As a result of Arietis' wrongful actions and inactions, patient information was stolen. Plaintiff and Class Members have had their PHI/PII compromised by nefarious third-party hackers, have had their privacy rights

violated, have been exposed to the risk of fraud and identify theft, and have otherwise suffered damages. Plaintiffs and Class Members bring this action to secure redress against Arietis.

## THE PARTIES

8. Plaintiff Robbin Ziegler is a resident of Manatee County and citizen of the State of Florida. Plaintiff Ziegler is a patient of Sarasota Anesthesia Services, LLC, a healthcare provider that uses Arietis' services. On or around September 29, 2023, Plaintiff Ziegler received a data breach notice from Arietis informing her that her PII/PHI—including her name, date of birth, medical record number, patient account number, health insurance information, diagnosis and treatment information, and provide name—had been breached as a result of the Data Breach.

9. Since the Data Breach occurred, Plaintiff Ziegler has experienced increased signs and attempts of fraud on her personal and financial accounts. These include, *inter alia*: (1) a fraudulent purchase made on her Amazon account using the same debit card that she used to pay for her healthcare services at Sarasota Anesthesia Services, LLC; (2) an attempt to gain unauthorized access to one of her debit cards through her Google account; (3) unauthorized activity on one of her checking accounts. Plaintiff Ziegler has spent substantial time dealing with and resolving the fallout of these fraudulent transactions, including cancelling her debit cards and closing her checking account.

10. As a result of the above and after learning of the Data Breach, Plaintiff Ziegler has experienced increased feelings of anxiety and paranoia. This has caused Plaintiff Ziegler to spend an increased amount of time dealing with the fallout of the Data Breach monitoring her personal and financial accounts, which she now does multiple times a day.

11. Defendant Arietis Health, LLC is a Delaware limited liability company with its principal addresses located at 13500 Powers Court, Suite 230, Fort Myers, FL 33912. Defendant's agent for service of process is Ashwini Kotwal, who can be served at that same address.

## **JURISDICTION AND VENUE**

12. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for claims that arise under the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state claims because they are so related to the federal claims in that they form a part of the same case or controversy.

13. Additionally, this Court has subject matter jurisdiction over the state law claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because upon the original filing of this complaint: (1) there exist putative

Class Members, such as Plaintiff, that are citizens of States diverse from Defendant;[3] (2) there are more than 100 putative Class Members; (3) and the amount in controversy exceeds $5 million.

14. The Court also has personal jurisdiction over Defendant because it is headquartered in and routinely conducts business in the state of Florida and has sufficient minimum contacts in Florida to have intentionally availed itself to this jurisdiction by operating and marketing its services in Florida.

15. Venue is proper in this District because, among other things: (a) Plaintiff is a resident of this District and a citizen of this state; (b) Defendant is a resident of this District and directed its activities at residents in this District; and (c) many of the acts and omissions that give rise to this Action took place in this judicial District for services provided in this district.

16. Venue is further appropriate in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiff resides in the Middle District, (b) Defendant conducts substantial business in the Middle District, (c) Defendant directed its services at residents in the Middle District; and (d) many of the acts and omissions that give rise to this Action took place in the Middle District.

---

[3] Additionally, there exist at least 7,265 putative Class Members in the State of Montana, many of whom are likely citizens. *See* https://dojmt.gov/consumer/databreach/.

## COUNT I

**Violation of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.***

17. The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701, *et seq.* provides consumers with redress if a company mishandles their electronically stored information, such as PHI/PII. The SCA was designed, in part, to protect individuals' privacy interests in personal and proprietary information.

18. Section 2702(a)(1) of the SCA states that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

19. "Electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

20. Through its computer equipment, Arietis provides an "electronic communication service to the public" within the meaning of the SCA.

### A. The Data Breach

21. Arietis is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA.") that collects, aggregates, and stores patient PII/PHI from over fifty different healthcare providers.

22. On or around May 31, 2023 Arietis' systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiffs' and Class Members' sensitive PII and PHI— including, *inter alia*, patients' names, addresses, dates of birth, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, provider names, social security numbers, driver's license numbers and potentially payment information—of at least 1,975,066 of its patients.

23. This data breach was the direct result of Arietis' failure to implement reasonable and adequate data security safeguards as required by statute and regulation and as promised on its public-facing website. Arietis' failure manifested not only in its failure to secure its own data environment, but to ensure the data security of its third-party vendors and agents when transferring sensitive patient PII/PHI through programs such as MOVEit.

24. Despite knowing the importance of protecting patient PHI/PII, Arietis ignored well-known safety risks and failed to provide adequate security to protect its patients' PHI/PII. As a result, Arietis knowingly divulged its patients' PHI/PII by failing to take commercially reasonable measures to protect its patients' PHI/PII, failing to adhere to applicable and statutorily required security and privacy standards.

**B. ARIETIS's Duty to Protect PII/PHI Under Federal Law.**

25. The duty of businesses such as ARIETIS to protect the PII and PHI that its patients entrust to it is recognized under Florida law, which states that entities such as Defendant, who acquire, maintain, store and use personal information, "shall take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. § 501.171.2(2).

26. Further, as a covered entity under HIPAA, ARIETIS holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiffs' and Class Members' PHI/PII.

27. Under the HIPAA Privacy Rule, ARIETIS is required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
d. Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

28. The HIPAA Privacy Rule also requires ARIETIS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures

for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

29. Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits ARIETIS from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

30. Arietis failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PHI/PII.

**C. Applicable Standards of Care**

31. In addition to its obligations under state and federal law, Arietis owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Arietis owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements,

and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the PHI/PII of Plaintiff and Class Members.

32. Arietis owed a duty to Plaintiff and Class Members to design, maintain, and test its computer system to ensure that the PHI/PII in Defendant's possession was adequately secured and protected.

33. Arietis owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII in its possession, including adequately training its employees and others who accessed the PHI/PII in Arietis' possession, adequately training its employees and others who accessed PII in its computer systems on how to adequately protect PHI/PII, and adequately vetting the data security of any third-party agents, vendors or programs to which it provided access to patient PII.

34. Arietis owed a duty of care to Plaintiff and Class Members to implement processes that would detect a breach of its data security systems in a timely manner.

35. Arietis owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

36. Arietis owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft because such an inadequacy would be a material fact

in the decision to provide or entrust their PHI/PII to Arietis.

37. Arietis owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when the data breach occurred.

38. Arietis owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Arietis received PHI/PII from Plaintiffs and Class Members with the understanding that Plaintiffs and Class Members expected their PHI/PII to be protected from disclosure. Arietis knew that a breach of its data systems would cause Plaintiffs and Class Members to incur damages.

**D. Stolen Information Is Valuable to Hackers and Thieves**

39. It is well known, and the subject of many media reports, that PHI/PII is highly coveted and a frequent target of hackers. Especially in the technology industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Defendant opted to maintain an insufficient and inadequate system to protect the PHI/PII of Plaintiffs and Class Members.

40. Plaintiff and Class Members value their PHI/PII, as in today's electronic-centric world, their PHI/PII is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

41. Legitimate organizations and criminal underground alike recognize the value of PHI/PII. That is why they aggressively seek and pay for it.

42. PHI/PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps."[4]

43. Once someone buys PHI/PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

44. In addition to PHI/PII, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[5]

---

[4] *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/ (last accessed October 19, 2023).

[5] *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data. (last accessed October 19, 2023).

45. As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[6]




46. Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing

---

6 Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/ (last accessed October 19, 2023).

them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[7]

### E. The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud

47. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to protect the PHI/PII of Plaintiffs and Class Members. The ramification of Defendant's failure to keep Plaintiffs' and Class Members' data secure is severe.

48. Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[8] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen, or unlawfully disclosed.[9] The frequency and severity of healthcare data breaches has only increased with time. 2021 was reported as the "worst ever year" for healthcare

---

[7] *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf (last accessed October 19, 2023).

[8] *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/. (last accessed October 19, 2023).

[9] *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed October 19, 2023).

data breaches—with at least 44,993,618 healthcare records having been exposed or stolen across 585 breaches.[10]

49. It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[11] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

### F. Annual Monetary Losses from Identity Theft Are in the Billions of Dollars

50. Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when PHI/PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen

[10] "Largest Healthcare Data Breaches of 2021," HIPPA Journal (Dec. 30, 2021), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2021/ (last accessed October 19, 2023)

[11] *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed October 19, 2023).

> data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao.gov/new.items/d07737.pdf. (last accessed October 19, 2023).

51. This is particularly the case with HIPAA data breaches such as Defendant's, as the information implicated, such as social security numbers or medical history, cannot be changed. Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[12] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[13]

52. Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[14] Victims of healthcare data

---

[12] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last accessed October 19, 2023).

[13] *Id.*

[14] *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/. (last accessed October 19, 2023).

breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[15]

53. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

### G. Plaintiff and Class Members Suffered Damages

54. The exposure of Plaintiffs' and Class Members' PHI/PII to unauthorized third-party hackers was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by and state and federal law. The data breach was also a result of Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PHI/PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, as required under state and federal law.

55. Plaintiff's and Class Members' PHI/PII is private and sensitive in nature and was inadequately protected by Defendant. Defendant did not obtain

---

[15] *Id.*

Plaintiff's and Class Members' consent to disclose their PHI/PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

56. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity. As a result, Plaintiffs and Class Members have lost time—in the form of the increased time monitoring their personal and financial accounts and dealing with the fallout of the Data Breach—and money—in the form of any out-of-pocket expenses incurred as a result of the data breach, including necessary purchases of credit or identity monitoring services to assist in the former.

57. Plaintiff and Class Members have also lost the value of their PHI/PII. PHI/PII is a valuable commodity, as evidenced by numerous companies which

purchase PII from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen PII across multiple different illicit websites.

58. Top10VPN, a secure network provider, compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified Paypal accounts with high balances are listed at as much as $2,000.

59. In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

60. Healthcare data is particularly valuable on the black market because it often contains an individual's PII and PHI, including information, such as a social

security number or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[16]

61. Finally, Plaintiffs have lost the benefit of their bargains. Plaintiffs and Class Members would not have paid for medical services from healthcare providers using Defendant's services had they been aware that that their PII/PHI would be provided to Defendant and subsequently stored and transferred in unsecure data environments. As a result, Plaintiffs and Class Members are entitled to, at minimum, the difference between what they would have paid for their medical services had it included RCM services that would store and transfer their data securely and the medical services that they actually paid for that did not.

62. Defendant's wrongful actions and inactions directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PHI/PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. The improper disclosure and theft of their PHI/PII;

b. The imminent and impending injury flowing from potential fraud

[16] "2018 Trustwave Global Security Report," TRUSTWAVE https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000 (last accessed October 19, 2023).

and identity theft posed by their PHI/PII being exposed to and misused by unauthorized third-party hackers;

c. The untimely and inadequate notification of the data breach;

d. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

e. Ascertainable losses in the form of deprivation of the value of their PHI/PII, for which there is a well-established national and international market.

f. Ascertainable loses in the form of Plaintiff's and Class Members' lost benefit of the bargains.

63. By failing to take reasonable steps to safeguard Plaintiff's and Class Members' PHI/PII while in electronic storage, Defendant has allowed unauthorized access to its electronic systems and knowingly divulged patient PHI/PII.

64. Section 2702(a)(2)(A) of the SCA provides that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service on behalf of, and received by means of electronic transmission from (or created by means of computer processing or communications received by means of electronic transmission from), a subscriber or customer of such service." 18

U.S.C. § 2702(a)(2)(A).

65. "Remote computing service" is defined as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2).

66. "Electronic communications system" is defined as "any wire, radio, electromagnetic, photo-optical or photo electronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications." 18 U.S.C § 2510(14).

67. Arietis stores its patients' PHI/PII and utilizes such information to provide services to its patients.

68. By failing to take reasonable steps to safeguard PHI/PII and allowing its computer systems to be breached, Defendant knowingly divulged Plaintiffs' and Class Members' PHI/PII, and which allowed unauthorized persons to access and use the PHI/PII for improper purposes.

69. Upon learning that its systems had been intruded upon and information had been obtained and accessed by unauthorized third parties, Defendant failed to promptly inform Plaintiffs and Class Members of the data breach and continued to knowingly divulge PHI/PII to third parties.

## H. CLASS ACTION ALLEGATIONS

70. Plaintiff brings this claim on their own behalf and pursuant to the Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intends to seek certification of the following Class, initially defined as follows:

> All persons residing in the United States of America who received a data breach notice informing them that their PHI/PII had been breached by unauthorized third parties as a result of Arietis Health LLC's data breach.

71. Excluded from each of the above Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judge and the court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

72. *Numerosity*, Fed. R. Civ. P. 23(a)(1): The members of the Class are so numerous that the joinder of all members is impractical. Presently, Plaintiffs are aware of at least 1,975,066 potential Class Members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, such as reservation receipts

and confirmations.

73. *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PHI/PII—including *inter alia*, properly vetting the data security of its third party agents and vendors prior to providing them access to patient PII/PHI;

b. Whether Defendant violated common and statutory law by failing to implement reasonable security procedures and practices;

c. Which security procedures and which data-breach notification procedure should Defendant be required to implement as part of any injunctive relief ordered by the Court;

d. Whether Defendant knew or should have known of the security breach prior to the disclosure;

e. Whether Defendant complied with any implied contractual obligation to use reasonable security measures;

f. Whether Defendant's acts and omissions described herein give rise to a claim of negligence;

g. Whether Defendant knew or should have known of the security breach prior to its disclosure;

h. Whether Defendant had a duty to promptly notify Plaintiffs and Class Members that their PHI/PII was, or potentially could be, compromised;

i. What security measures, if any, must be implemented by Defendant to comply with its duties under state and federal law;

j. The nature of the relief, including equitable relief, to which Plaintiffs and the Class Members are entitled; and

k. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, and/or injunctive relief.

74. *Typicality*. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI/PII, like that of every other Class Member, was misused and/or disclosed by Defendant.

75. *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously. Plaintiff's claims are typical of the claims of Class Members and Plaintiff have the same non-conflicting interests as the other Class Members.

Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and their counsel.

76. *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

77. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied.

78. Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

79. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## COUNT II

## Negligence

### A. The Data Breach

80. Arietis is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA.") that collects, aggregates, and stores patient PII/PHI from over fifty different healthcare providers.

81. On or around May 31, 2023 Arietis' systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiffs' and Class Members' sensitive PII and PHI— including, *inter alia*, patients' names, addresses, dates of birth, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, provider names, social security numbers, driver's license numbers and potentially payment information—of at least 1,975,066 of its patients.

82. This data breach was the direct result of Arietis' failure to implement reasonable and adequate data security safeguards as required by statute and regulation and as promised on its public-facing website. Arietis' failure manifested not only in its failure to secure its own data environment, but to ensure the data security of its third-party vendors and agents when transferring sensitive patient PII/PHI through programs such as MOVEit.

83. Despite knowing the importance of protecting patient PHI/PII, Arietis ignored well-known safety risks and failed to provide adequate security to protect its patients' PHI/PII. As a result, Arietis knowingly divulged its patients' PHI/PII by failing to take commercially reasonable measures to protect its patients' PHI/PII, failing to adhere to applicable and statutorily required security and privacy standards.

**B. ARIETIS's Duty to Protect PII/PHI Under Federal Law.**

84. The duty of businesses such as ARIETIS to protect the PII and PHI that its patients entrust to it is recognized under Florida law, which states that entities such as Defendant, who acquire, maintain, store and use personal information, "shall take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. § 501.171.2(2).

85. Further, as a covered entity under HIPAA, ARIETIS holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiffs' and Class Members' PHI/PII.

86. Under the HIPAA Privacy Rule, ARIETIS is required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted;

and

d. Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

87. The HIPAA Privacy Rule also requires ARIETIS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

88. Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits ARIETIS from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

89. Arietis failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PHI/PII.

## C. Applicable Standards of Care

90. In addition to its obligations under state and federal law, Arietis owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Arietis owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the PHI/PII of Plaintiff and Class Members.

91. Arietis owed a duty to Plaintiff and Class Members to design, maintain, and test its computer system to ensure that the PHI/PII in Defendant's possession was adequately secured and protected.

92. Arietis owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII in its possession, including adequately training its employees and others who accessed the PHI/PII in Arietis' possession, adequately training its employees and others who accessed PII in its computer systems on how to adequately protect PHI/PII, and adequately vetting the data security of any third-party agents, vendors or programs to which it provided access to patient PII.

93. Arietis owed a duty of care to Plaintiff and Class Members to implement processes that would detect a breach of its data security systems in a timely manner.

94. Arietis owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

95. Arietis owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft because such an inadequacy would be a material fact in the decision to provide or entrust their PHI/PII to Arietis.

96. Arietis owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when the data breach occurred.

97. Arietis owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Arietis received PHI/PII from Plaintiffs and Class Members with the understanding that Plaintiffs and Class Members expected their PHI/PII to be protected from disclosure. Arietis knew that a breach of its data systems would cause Plaintiffs and Class Members to incur damages.

**D. Stolen Information Is Valuable to Hackers and Thieves**

98. It is well known, and the subject of many media reports, that PHI/PII is highly coveted and a frequent target of hackers. Especially in the technology

industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Defendant opted to maintain an insufficient and inadequate system to protect the PHI/PII of Plaintiffs and Class Members.

99. Plaintiff and Class Members value their PHI/PII, as in today's electronic-centric world, their PHI/PII is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

100. Legitimate organizations and criminal underground alike recognize the value of PHI/PII. That is why they aggressively seek and pay for it.

101. PHI/PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps."[17]

102. Once someone buys PHI/PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

[17] *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/ (last accessed October 19, 2023).

103. In addition to PHI/PII, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[18]

104. As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[19]




105. Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on

---

[18] *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data. (last accessed October 19, 2023).

[19] Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/ (last accessed October 19, 2023).

the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[20]

**E. The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud**

106. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to protect the PHI/PII of Plaintiffs and Class Members. The ramification of Defendant's failure to keep Plaintiffs' and Class Members' data secure is severe.

107. Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[21] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen,

[20] *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs /report_on_phishing.pdf (last accessed October 19, 2023).

[21] *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/. (last accessed October 19, 2023).

or unlawfully disclosed.[22] The frequency and severity of healthcare data breaches has only increased with time. 2021 was reported as the "worst ever year" for healthcare data breaches—with at least 44,993,618 healthcare records having been exposed or stolen across 585 breaches.[23]

108. It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[24] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

## F. Annual Monetary Losses from Identity Theft Are in the Billions of Dollars

109. Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when PHI/PII is stolen and when it is

---

[22] *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed October 19, 2023).

[23] "Largest Healthcare Data Breaches of 2021," HIPPA Journal (Dec. 30, 2021), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2021/ (last accessed October 19, 2023)

[24] *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed October 19, 2023).

used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao.gov/new.items/d07737.pdf. (last accessed October 19, 2023).

110. This is particularly the case with HIPAA data breaches such as Defendant's, as the information implicated, such as social security numbers or medical history, cannot be changed. Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[25] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[26]

---

[25] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last accessed October 19, 2023).
[26] *Id.*

111. Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[27] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[28]

112. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

**G. Plaintiff and Class Members Suffered Damages**

113. The exposure of Plaintiffs' and Class Members' PHI/PII to unauthorized third-party hackers was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by and state and federal law. The data breach was also a result of Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security

---

[27] *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/. (last accessed October 19, 2023).

[28] *Id.*

and confidentiality of Plaintiff's and Class Members' PHI/PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, as required under state and federal law.

114. Plaintiff's and Class Members' PHI/PII is private and sensitive in nature and was inadequately protected by Defendant. Defendant did not obtain Plaintiff's and Class Members' consent to disclose their PHI/PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

115. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity. As a result, Plaintiffs and Class Members have lost time—in the form of the increased time monitoring their personal and financial accounts and dealing with the

fallout of the Data Breach—and money—in the form of any out-of-pocket expenses incurred as a result of the data breach, including necessary purchases of credit or identity monitoring services to assist in the former.

116. Plaintiff and Class Members have also lost the value of their PHI/PII. PHI/PII is a valuable commodity, as evidenced by numerous companies which purchase PII from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen PII across multiple different illicit websites.

117. Top10VPN, a secure network provider, compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified Paypal accounts with high balances are listed at as much as $2,000.

118. In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |

| | |
|---|---|
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

119. Healthcare data is particularly valuable on the black market because it often contains an individual's PII and PHI, including information, such as a social security number or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[29]

120. Finally, Plaintiffs have lost the benefit of their bargains. Plaintiffs and Class Members would not have paid for medical services from healthcare providers using Defendant's services had they been aware that that their PII/PHI would be provided to Defendant and subsequently stored and transferred in unsecure data environments. As a result, Plaintiffs and Class Members are entitled to, at minimum, the difference between what they would have paid for their medical services had it included RCM services that would store and transfer their data securely and the medical services that they actually paid for that did not.

121. Defendant's wrongful actions and inactions directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class

[29] "2018 Trustwave Global Security Report," TRUSTWAVE https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000 (last accessed October 19, 2023).

Members' PHI/PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. The improper disclosure and theft of their PHI/PII;

b. The imminent and impending injury flowing from potential fraud and identity theft posed by their PHI/PII being exposed to and misused by unauthorized third-party hackers;

c. The untimely and inadequate notification of the data breach;

d. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

e. Ascertainable losses in the form of deprivation of the value of their PHI/PII, for which there is a well-established national and international market.

f. Ascertainable loses in the form of Plaintiff's and Class Members' lost benefit of the bargains.

122. Defendant owed Plaintiffs and the Class Members a duty of care in the handling of its patients' PHI/PII. This duty included, but was not limited to, keeping that PHI/PII secure and preventing disclosure of the PHI/PII to any unauthorized third parties. This duty of care existed independently of Defendant's contractual

duties to Plaintiffs and Class Members. Under the FTC Guidelines, and other sources of industry-wide cybersecurity standards, Defendant is obligated to incorporate adequate measures to safeguard and protect PHI/PII that is entrusted to it in its ordinary course of business and transactions with customers.

123. Pursuant to Fla. Stat. § 501.171.2(2), Defendant was required to "take reasonable measures to protect and secure data in electronic form containing personal information," which included the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information from unauthorized access, destruction, use, modification or disclosure."

124. Pursuant to the Federal Trade Commission Act (15 U.S.C. § 45), Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI/PII. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the businesses' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders from these actions further clarify the measures businesses are required to undertake to satisfy their data security

obligations.[30]

125. Additional industry guidelines which provide a standard of care can be found in NIST's *Framework for Improving Critical Infrastructure Cybersecurity*.[31] NIST's Framework identifies seven steps for establishing or improving a cybersecurity program (section 3.2). Those steps are:

> *Step 1: Prioritize and Scope*. The organization identifies its business/mission objectives and high-level organizational priorities. With this information, the organization makes strategic decisions regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process. The Framework can be adapted to support the different business lines or processes within an organization, which may have different business needs and associated risk tolerance. Risk tolerances may be reflected in a target Implementation Tier.
>
> *Step 2: Orient*. Once the scope of the cybersecurity program has been determined for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach. The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.
>
> *Step 3: Create a Current Profile*. The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved. If an outcome is partially achieved, noting this fact will help support subsequent

---

[30] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last accessed October 19, 2023).

[31] "Framework for Improving Critical Infrastructure Cybersecurity," National Institute for Standards and Technology, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last accessed October 19, 2023).

steps by providing baseline information.

*Step 4: Conduct a Risk Assessment*. This assessment could be guided by the organization's overall risk management process or previous risk assessment activities. The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization. It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity events.

*Step 5: Create a Target Profile*. The organization creates a Target Profile that focuses on the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes. Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks. The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile. The Target Profile should appropriately reflect criteria within the target Implementation Tier.

*Step 6: Determine, Analyze, and Prioritize Gaps*. The organization compares the Current Profile and the Target Profile to determine gaps. Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile. The organization then determines resources, including funding and workforce, necessary to address the gaps. Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.

> _Step 7: Implement Action Plan_. The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile. For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

126. In addition to its obligations under state and federal regulations and industry standards, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PHI/PII in Arietis' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the PHI/PII of Plaintiff and Class Members.

127. Defendant owed a duty to Plaintiff and Class Members to properly ensure the data security environment of its third party agents, vendors and programs—such as the MOVEit software—that it provided access to patient PII/PHI.

128. Defendant owed a duty to Plaintiff and Class Members to design, maintain, and test its internal data systems to ensure that the PHI/PII in Defendant's

possession was adequately secured and protected.

129. Defendant owed a duty to Plaintiff sand Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII in its custodianship, including adequately training its employees and others who accessed PHI/PII within its computer systems on how to adequately protect PHI/PII.

130. Defendant owed a duty to Plaintiff and Class Members to implement processes or safeguards that would detect a breach of its data security systems in a timely manner.

131. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

132. Defendant owed a duty to Plaintiff and Class Members to timely disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft because such an inadequacy would be a material consideration in Plaintiff and Class Members' decisions to entrust their PHI/PII to Defendant.

133. Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when data breaches occur.

134. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices and systems. Defendant collected PHI/PII from Plaintiff and Class Members.

Defendant knew that a breach of its data systems would cause Plaintiff and Class Members to incur damages.

135. Defendant breached its duties of care to safeguard and protect the PHI/PII which Plaintiff and Class Members entrusted to it. Upon information and belief, Defendant adopted inadequate safeguards to protect the PHI/PII and failed to adopt industry-wide standards set forth above in its supposed protection of the PHI/PII. Defendant failed to design, maintain, and test its computer system to ensure that the PHI/PII was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect a breach of its data security systems in a timely manner, failed to disclose the breach to potentially affected customers in a timely and comprehensive manner, and otherwise breached each of the above duties of care by implementing careless security procedures which led directly to the breach.

136. Defendant breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, NIST's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Defendant failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Member's PHI/PII. In violation of the FTC guidelines, *inter alia*, Defendant did not protect the personal customer information that it keeps; failed to properly dispose of personal information that was no longer needed; failed

to encrypt information stored on computer networks; lacked the requisite understanding of their network's vulnerabilities; and failed to implement policies to correct security problems. In violation of the NIST's Framework, Defendant, *inter alia*, failed to adopt sufficient resources to identify and address security gaps.

137. Defendant's failure to comply with applicable laws and regulations constitutes negligence per se.

138. As a direct and proximate result of Defendant's failure to adequately protect and safeguard the PHI/PII, Plaintiff and Class Members suffered damages. Plaintiff and Class Members were damaged because their PHI/PII was accessed by third parties, resulting in increased risk of identity theft, property theft and extortion for which Plaintiff and Class Members were forced to adopt preventive and remedial efforts. These damages were magnified by the passage of time because Defendant failed to notify Plaintiff and Class Members of the data breach until weeks had passed. In addition, Plaintiff and Class Members were also damaged in that they must now spend copious amounts of time combing through their records to ensure that they do not become the victims of fraud and/or identity theft, as well as in the loss of the benefit of their bargains.

## H. CLASS ACTION ALLEGATIONS

139. Plaintiff brings this claim on their own behalf and pursuant to the Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intend to

seek certification of the following Class, initially defined as follows:

> All persons residing in the United States of America who received a data breach notice informing them that their PHI/PII had been breached by unauthorized third parties as a result of Arietis Health LLC's data breach.

140. Excluded from each of the above Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judge and the court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

141. *Numerosity*, Fed. R. Civ. P. 23(a)(1): The members of the Class are so numerous that the joinder of all members is impractical. Presently, Plaintiffs are aware of at least 1,975,066 potential Class Members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, such as reservation receipts and confirmations.

142. *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions

affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PHI/PII—including *inter alia*, properly vetting the data security of its third party agents and vendors prior to providing them access to patient PII/PHI;

b. Whether Defendant violated common and statutory law by failing to implement reasonable security procedures and practices;

c. Which security procedures and which data-breach notification procedure should Defendant be required to implement as part of any injunctive relief ordered by the Court;

d. Whether Defendant knew or should have known of the security breach prior to the disclosure;

e. Whether Defendant complied with any implied contractual obligation to use reasonable security measures;

f. Whether Defendant's acts and omissions described herein give rise to a claim of negligence;

g. Whether Defendant knew or should have known of the security breach prior to its disclosure;

h. Whether Defendant had a duty to promptly notify Plaintiffs and

Class Members that their PHI/PII was, or potentially could be, compromised;

i. What security measures, if any, must be implemented by Defendant to comply with its duties under state and federal law;

j. The nature of the relief, including equitable relief, to which Plaintiffs and the Class Members are entitled; and

k. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, and/or injunctive relief.

143. *Typicality*. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI/PII, like that of every other Class Member, was misused and/or disclosed by Defendant.

144. *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously. Plaintiff's claims are typical of the claims of Class Members and Plaintiff have the same non-conflicting interests as the other Class Members. Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and their counsel.

145. *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

146. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied.

147. Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

148. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## COUNT III

### Breach of Third Party Beneficiary Contract

### A. The Data Breach

149. Arietis is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA.") that collects, aggregates, and stores patient PII/PHI from over fifty different healthcare providers.

150. On or around May 31, 2023 Arietis' systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiffs' and Class Members' sensitive PII and PHI— including, *inter alia*, patients' names, addresses, dates of birth, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, provider names, social security numbers, driver's license numbers and potentially payment information—of at least 1,975,066 of its patients.

151. This data breach was the direct result of Arietis' failure to implement reasonable and adequate data security safeguards as required by statute and regulation and as promised on its public-facing website. Arietis' failure manifested not only in its failure to secure its own data environment, but to ensure the data security of its third-party vendors and agents when transferring sensitive patient PII/PHI through programs such as MOVEit.

152. Despite knowing the importance of protecting patient PHI/PII, Arietis ignored well-known safety risks and failed to provide adequate security to protect its patients' PHI/PII. As a result, Arietis knowingly divulged its patients' PHI/PII by failing to take commercially reasonable measures to protect its patients' PHI/PII, failing to adhere to applicable and statutorily required security and privacy standards.

**B. ARIETIS's Duty to Protect PII/PHI Under Federal Law.**

153. The duty of businesses such as ARIETIS to protect the PII and PHI that its patients entrust to it is recognized under Florida law, which states that entities such as Defendant, who acquire, maintain, store and use personal information, "shall take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. § 501.171.2(2).

154. Further, as a covered entity under HIPAA, ARIETIS holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiffs' and Class Members' PHI/PII.

155. Under the HIPAA Privacy Rule, ARIETIS is required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted;

and

d. Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

156. The HIPAA Privacy Rule also requires ARIETIS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

157. Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits ARIETIS from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

158. Arietis failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PHI/PII.

## C. Applicable Standards of Care

159. In addition to its obligations under state and federal law, Arietis owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Arietis owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the PHI/PII of Plaintiff and Class Members.

160. Arietis owed a duty to Plaintiff and Class Members to design, maintain, and test its computer system to ensure that the PHI/PII in Defendant's possession was adequately secured and protected.

161. Arietis owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII in its possession, including adequately training its employees and others who accessed the PHI/PII in Arietis' possession, adequately training its employees and others who accessed PII in its computer systems on how to adequately protect PHI/PII, and adequately vetting the data security of any third-party agents, vendors or programs to which it provided access to patient PII.

162. Arietis owed a duty of care to Plaintiff and Class Members to implement processes that would detect a breach of its data security systems in a timely manner.

163. Arietis owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

164. Arietis owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft because such an inadequacy would be a material fact in the decision to provide or entrust their PHI/PII to Arietis.

165. Arietis owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when the data breach occurred.

166. Arietis owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Arietis received PHI/PII from Plaintiffs and Class Members with the understanding that Plaintiffs and Class Members expected their PHI/PII to be protected from disclosure. Arietis knew that a breach of its data systems would cause Plaintiffs and Class Members to incur damages.

**D. Stolen Information Is Valuable to Hackers and Thieves**

167. It is well known, and the subject of many media reports, that PHI/PII is highly coveted and a frequent target of hackers. Especially in the technology

industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Defendant opted to maintain an insufficient and inadequate system to protect the PHI/PII of Plaintiffs and Class Members.

168. Plaintiff and Class Members value their PHI/PII, as in today's electronic-centric world, their PHI/PII is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

169. Legitimate organizations and criminal underground alike recognize the value of PHI/PII. That is why they aggressively seek and pay for it.

170. PHI/PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps."[32]

171. Once someone buys PHI/PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

[32] *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/ (last accessed October 19, 2023).

172. In addition to PHI/PII, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[33]

173. As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[34]




174. Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large

[33] *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data. (last accessed October 19, 2023).

[34] Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/ (last accessed October 19, 2023).

telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[35]

### E. The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud

175. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to protect the PHI/PII of Plaintiffs and Class Members. The ramification of Defendant's failure to keep Plaintiffs' and Class Members' data secure is severe.

176. Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[36] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen, or unlawfully disclosed.[37] The frequency and severity of healthcare data breaches

---

[35] *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf (last accessed October 19, 2023).

[36] *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/. (last accessed October 19, 2023).

[37] *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed October 19, 2023).

has only increased with time. 2021 was reported as the "worst ever year" for healthcare data breaches—with at least 44,993,618 healthcare records having been exposed or stolen across 585 breaches.[38]

177. It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[39] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

**F. Annual Monetary Losses from Identity Theft Are in the Billions of Dollars**

178. Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when PHI/PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[38] "Largest Healthcare Data Breaches of 2021," HIPPA Journal (Dec. 30, 2021), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2021/ (last accessed October 19, 2023)

[39] *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed October 19, 2023).

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao.gov/new.items/d07737.pdf. (last accessed October 19, 2023).

179. This is particularly the case with HIPAA data breaches such as Defendant's, as the information implicated, such as social security numbers or medical history, cannot be changed. Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[40] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[41]

180. Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to

[40] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last accessed October 19, 2023).
[41] *Id.*

pay out-of-pocket costs for fraudulent medical care.[42] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[43]

181. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

**G. Plaintiff and Class Members Suffered Damages**

182. The exposure of Plaintiffs' and Class Members' PHI/PII to unauthorized third-party hackers was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by and state and federal law. The data breach was also a result of Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PHI/PII in order to protect

---

[42] *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/. (last accessed October 19, 2023).

[43] *Id.*

against reasonably foreseeable threats to the security or integrity of such information, as required under state and federal law.

183. Plaintiff's and Class Members' PHI/PII is private and sensitive in nature and was inadequately protected by Defendant. Defendant did not obtain Plaintiff's and Class Members' consent to disclose their PHI/PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

184. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity. As a result, Plaintiffs and Class Members have lost time—in the form of the increased time monitoring their personal and financial accounts and dealing with the fallout of the Data Breach—and money—in the form of any out-of-pocket expenses

incurred as a result of the data breach, including necessary purchases of credit or identity monitoring services to assist in the former.

185. Plaintiff and Class Members have also lost the value of their PHI/PII. PHI/PII is a valuable commodity, as evidenced by numerous companies which purchase PII from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen PII across multiple different illicit websites.

186. Top10VPN, a secure network provider, compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified Paypal accounts with high balances are listed at as much as $2,000.

187. In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |

| | |
|---|---|
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

188. Healthcare data is particularly valuable on the black market because it often contains an individual's PII and PHI, including information, such as a social security number or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[44]

189. Finally, Plaintiffs have lost the benefit of their bargains. Plaintiffs and Class Members would not have paid for medical services from healthcare providers using Defendant's services had they been aware that that their PII/PHI would be provided to Defendant and subsequently stored and transferred in unsecure data environments. As a result, Plaintiffs and Class Members are entitled to, at minimum, the difference between what they would have paid for their medical services had it included RCM services that would store and transfer their data securely and the medical services that they actually paid for that did not.

190. Defendant's wrongful actions and inactions directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PHI/PII, causing them to suffer, and continue to suffer, economic

---

[44] "2018 Trustwave Global Security Report," TRUSTWAVE https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000 (last accessed October 19, 2023).

damages and other actual harm for which they are entitled to compensation, including:

a. The improper disclosure and theft of their PHI/PII;

b. The imminent and impending injury flowing from potential fraud and identity theft posed by their PHI/PII being exposed to and misused by unauthorized third-party hackers;

c. The untimely and inadequate notification of the data breach;

d. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

e. Ascertainable losses in the form of deprivation of the value of their PHI/PII, for which there is a well-established national and international market.

f. Ascertainable loses in the form of Plaintiff's and Class Members' lost benefit of the bargains.

191. Defendant entered into written contracts with its clients, such as Sarasota Anesthesia Services, LLC. Under statute and regulation, these contracts obligated Defendant to reasonably safeguard Plaintiff's and Class Members' PII/PHI from unauthorized third-party access by, *inter alia*, implementing reasonable and adequate data security safeguards. These data security safeguards must have

included provisions requiring Defendant to properly vet the data security safeguards of any third-party agent, vendor or program that it provided with access to patient PII, such as MOVEit.

192. Defendant breached the terms of its contracts with its clients, such as Sarasota Anesthesia Services, LLC, by failing to implement the above-described reasonable and adequate data security safeguards. As a result, Plaintiff's and Class members' PII/PHI was breached by unauthorized third-party hackers.

193. As a direct and proximate result of Defendant's breach, Plaintiff and Class Members, who are third party beneficiaries of Defendant's contracts, have been injured and have suffered—and will continue to suffer—injuries, damages, and harm as set forth herein.

## H. CLASS ACTION ALLEGATIONS

194. Plaintiff brings this claim on their own behalf and pursuant to the Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intend to seek certification of the following Class, initially defined as follows:

> All persons residing in the United States of America who received a data breach notice informing them that their PHI/PII had been breached by unauthorized third parties as a result of Arietis Health LLC's data breach.

195. Excluded from each of the above Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judge and the court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

196. *Numerosity*, Fed. R. Civ. P. 23(a)(1): The members of the Class are so numerous that the joinder of all members is impractical. Presently, Plaintiffs are aware of at least 1,975,066 potential Class Members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, such as reservation receipts and confirmations.

197. *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PHI/PII—including *inter alia*, properly vetting the data security of its third party agents and vendors prior to providing them access to patient PII/PHI;

b. Whether Defendant violated common and statutory law by failing to implement reasonable security procedures and practices;

c. Which security procedures and which data-breach notification procedure should Defendant be required to implement as part of any injunctive relief ordered by the Court;

d. Whether Defendant knew or should have known of the security breach prior to the disclosure;

e. Whether Defendant complied with any implied contractual obligation to use reasonable security measures;

f. Whether Defendant's acts and omissions described herein give rise to a claim of negligence;

g. Whether Defendant knew or should have known of the security breach prior to its disclosure;

h. Whether Defendant had a duty to promptly notify Plaintiffs and Class Members that their PHI/PII was, or potentially could be, compromised;

i. What security measures, if any, must be implemented by Defendant to comply with its duties under state and federal law;

j. The nature of the relief, including equitable relief, to which Plaintiffs and the Class Members are entitled; and

k. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, and/or injunctive relief.

198. *Typicality*. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI/PII, like that of every other Class Member, was misused and/or disclosed by Defendant.

199. *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously. Plaintiff's claims are typical of the claims of Class Members and Plaintiff have the same non-conflicting interests as the other Class Members. Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and their counsel.

200. *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

201. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied.

202. Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

203. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## COUNT IV

### Quasi-Contract/Unjust Enrichment

204. This count is pled in the alternative to Plaintiffs' Count III breach of third party contract claim above.

### A. The Data Breach

205. Arietis is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA.") that collects, aggregates, and stores patient PII/PHI from over fifty different healthcare providers.

206. On or around May 31, 2023 Arietis' systems were accessed by unauthorized third-party hackers, who exfiltrated Plaintiffs' and Class Members' sensitive PII and PHI— including, *inter alia*, patients' names, addresses, dates of birth, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, provider names, social security numbers, driver's license numbers and potentially payment information—of at least 1,975,066 of its patients.

207. This data breach was the direct result of Arietis' failure to implement reasonable and adequate data security safeguards as required by statute and regulation and as promised on its public-facing website. Arietis' failure manifested not only in its failure to secure its own data environment, but to ensure the data security of its third-party vendors and agents when transferring sensitive patient PII/PHI through programs such as MOVEit.

208. Despite knowing the importance of protecting patient PHI/PII, Arietis ignored well-known safety risks and failed to provide adequate security to protect its patients' PHI/PII. As a result, Arietis knowingly divulged its patients' PHI/PII by failing to take commercially reasonable measures to protect its patients' PHI/PII, failing to adhere to applicable and statutorily required security and privacy standards.

**B. ARIETIS's Duty to Protect PII/PHI Under Federal Law.**

209. The duty of businesses such as ARIETIS to protect the PII and PHI that its patients entrust to it is recognized under Florida law, which states that entities such as Defendant, who acquire, maintain, store and use personal information, "shall take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. § 501.171.2(2).

210. Further, as a covered entity under HIPAA, ARIETIS holds a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiffs' and Class Members' PHI/PII.

211. Under the HIPAA Privacy Rule, ARIETIS is required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives maintains or transmits;
b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
d. Ensure compliance by their workforce.

45 C.F.R. § 164.306(a).

212. The HIPAA Privacy Rule also requires ARIETIS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures

for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312(a)(1).

213. Further, the Federal Trade Commission Act, 15 U.S.C. § 45 prohibits ARIETIS from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the Federal Trade Commission Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3rd Cir. 2015).

214. Arietis failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiffs' and Class Members' PHI/PII.

**C. Applicable Standards of Care**

215. In addition to its obligations under state and federal law, Arietis owed a duty to Plaintiff and the Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Arietis owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements,

and to ensure that its computer system and networks, and the personnel responsible for them, adequately protected the PHI/PII of Plaintiff and Class Members.

216. Arietis owed a duty to Plaintiff and Class Members to design, maintain, and test its computer system to ensure that the PHI/PII in Defendant's possession was adequately secured and protected.

217. Arietis owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII in its possession, including adequately training its employees and others who accessed the PHI/PII in Arietis' possession, adequately training its employees and others who accessed PII in its computer systems on how to adequately protect PHI/PII, and adequately vetting the data security of any third-party agents, vendors or programs to which it provided access to patient PII.

218. Arietis owed a duty of care to Plaintiff and Class Members to implement processes that would detect a breach of its data security systems in a timely manner.

219. Arietis owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

220. Arietis owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft because such an inadequacy would be a material fact

in the decision to provide or entrust their PHI/PII to Arietis.

221. Arietis owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when the data breach occurred.

222. Arietis owed a duty of care to Plaintiff and the Class Members because they were foreseeable and probable victims of any inadequate data security practices. Arietis received PHI/PII from Plaintiffs and Class Members with the understanding that Plaintiffs and Class Members expected their PHI/PII to be protected from disclosure. Arietis knew that a breach of its data systems would cause Plaintiffs and Class Members to incur damages.

**D. Stolen Information Is Valuable to Hackers and Thieves**

223. It is well known, and the subject of many media reports, that PHI/PII is highly coveted and a frequent target of hackers. Especially in the technology industry, the issue of data security and threats thereto is well known. Despite well-publicized litigation and frequent public announcements of data breaches, Defendant opted to maintain an insufficient and inadequate system to protect the PHI/PII of Plaintiffs and Class Members.

224. Plaintiff and Class Members value their PHI/PII, as in today's electronic-centric world, their PHI/PII is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

225. Legitimate organizations and criminal underground alike recognize the value of PHI/PII. That is why they aggressively seek and pay for it.

226. PHI/PII is highly valuable to hackers. Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. PII that is stolen from the point of sale are known as "dumps."[45]

227. Once someone buys PHI/PII, it is then used to gain access to different areas of the victim's digital life, including bank accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

228. In addition to PHI/PII, a hacked email account can be very valuable to cyber criminals. Since most online accounts require an email address not only as a username, but also to verify accounts and reset passwords, a hacked email account could open up a number of other accounts to an attacker.[46]

[45] *See All About Fraud: How Crooks Get the CVV*, Krebs on Security (April 26, 2016), https://krebsonsecurity.com/2016/04/all-about-fraud-how-crooks-get-the-cvv/ (last accessed October 19, 2023).

[46] *Identity Theft and the Value of Your Personal Data*, Trend Micro (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data. (last accessed October 19, 2023).

229. As shown below, a hacked email account can be used to link to many other sources of information for an identity thief, including any purchase or account information found in the hacked email account.[47]




230. Hacked information can also enable thieves to obtain other personal information through "phishing." According to the Report on Phishing available on the United States, Department of Justice's website: "AT&T, a large telecommunications company, had its sales system hacked into, resulting in stolen order information including full names and home addresses, order numbers and credit card numbers. The hackers then sent each customer a highly personalized e-mail indicating that there had been a problem processing their order and re-directing

47 Brian Krebs, *The Value of a Hacked Email Account*, Krebs on Security (June 13, 2013), https://krebsonsecurity.com/2013/06/the-value-of-a-hacked-email-account/ (last accessed October 19, 2023).

them to a spoofed website where they were prompted to enter further information, including birthdates and Social Security numbers."[48]

### E. The Data Breach Has and Will Result in Additional Identity Theft and Identity Fraud

231. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to protect the PHI/PII of Plaintiffs and Class Members. The ramification of Defendant's failure to keep Plaintiffs' and Class Members' data secure is severe.

232. Between 2005 and 2019, at least 249 million individuals were affected by health care data breaches.[49] In 2019 alone, over 505 data HIPAA data breaches were reported, resulting in over 41 million healthcare records being exposed, stolen, or unlawfully disclosed.[50] The frequency and severity of healthcare data breaches has only increased with time. 2021 was reported as the "worst ever year" for

---

[48] *Report on Phishing* (Oct. 2006), https://www.justice.gov/archive/opa/docs/report_on_phishing.pdf (last accessed October 19, 2023).

[49] *Healthcare Data Breaches: Insights and Implications*, National Library of Medicine (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/. (last accessed October 19, 2023).

[50] *December 2019 Healthcare Data Breach*, HIPAA Journal (Jan 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed October 19, 2023).

healthcare data breaches—with at least 44,993,618 healthcare records having been exposed or stolen across 585 breaches.[51]

233. It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[52] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*.

## F. Annual Monetary Losses from Identity Theft Are in the Billions of Dollars

234. Javelin Strategy and Research reports that losses from identity theft reached $21 billion in 2013. There may be a time lag between when harm occurs and when it is discovered, and also between when PHI/PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen

[51] "Largest Healthcare Data Breaches of 2021," HIPPA Journal (Dec. 30, 2021), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2021/ (last accessed October 19, 2023)

[52] *See Victims of Identity Theft*, U.S. Department of Justice (September 2015, revised November 13, 2017), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (last accessed October 19, 2023).

> data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO, Report to Congressional Requesters (June 2007), http://www.gao. gov/new.items/d07737.pdf. (last accessed October 19, 2023).

235. This is particularly the case with HIPAA data breaches such as Defendant's, as the information implicated, such as social security numbers or medical history, cannot be changed. Once such information is breached, malicious actors can continue misusing the stolen information for years to come. Indeed, medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft.[53] Victims of medical identity theft "often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[54]

236. Indeed, a study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[55] Victims of healthcare data

---

[53] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare* (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/. (last accessed October 19, 2023).

[54] *Id.*

[55] *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/. (last accessed October 19, 2023).

breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[56]

237. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any financial or identity fraud they suffer.

## G. Plaintiff and Class Members Suffered Damages

238. The exposure of Plaintiffs' and Class Members' PHI/PII to unauthorized third-party hackers was a direct and proximate result of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' PII from unauthorized access, use, and disclosure, as required by and state and federal law. The data breach was also a result of Defendant's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PHI/PII in order to protect against reasonably foreseeable threats to the security or integrity of such information, as required under state and federal law.

239. Plaintiff's and Class Members' PHI/PII is private and sensitive in nature and was inadequately protected by Defendant. Defendant did not obtain

[56] *Id.*

Plaintiff's and Class Members' consent to disclose their PHI/PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

240. As a direct and proximate result of Defendant's wrongful actions and inaction and the resulting data breach, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, paying for credit and identity monitoring services, spending time on credit and identity monitoring, placing "freezes" and "alerts" with credit reporting agencies, contacting their personal, financial and healthcare institutions, closing or modifying personal, financial or healthcare accounts, and closely reviewing and monitoring their credit reports, financial accounts and healthcare accounts for unauthorized activity. As a result, Plaintiffs and Class Members have lost time—in the form of the increased time monitoring their personal and financial accounts and dealing with the fallout of the Data Breach—and money—in the form of any out-of-pocket expenses incurred as a result of the data breach, including necessary purchases of credit or identity monitoring services to assist in the former.

241. Plaintiff and Class Members have also lost the value of their PHI/PII. PHI/PII is a valuable commodity, as evidenced by numerous companies which

purchase PII from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen PII across multiple different illicit websites.

242. Top10VPN, a secure network provider, compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified Paypal accounts with high balances are listed at as much as $2,000.

243. In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

244. Healthcare data is particularly valuable on the black market because it often contains an individual's PII and PHI, including information, such as a social

security number or diagnosis and medical treatment information, that is not easily, or outright cannot be changed in response to a data breach. As a result, a healthcare data record may be valued at up to **$250 per record**.[57]

245. Finally, Plaintiffs have lost the benefit of their bargains. Plaintiffs and Class Members would not have paid for medical services from healthcare providers using Defendant's services had they been aware that that their PII/PHI would be provided to Defendant and subsequently stored and transferred in unsecure data environments. As a result, Plaintiffs and Class Members are entitled to, at minimum, the difference between what they would have paid for their medical services had it included RCM services that would store and transfer their data securely and the medical services that they actually paid for that did not.

246. Defendant's wrongful actions and inactions directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class Members' PHI/PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. The improper disclosure and theft of their PHI/PII;

b. The imminent and impending injury flowing from potential fraud

[57] "2018 Trustwave Global Security Report," TRUSTWAVE https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf?rnd=131992184400000000 (last accessed October 19, 2023).

and identity theft posed by their PHI/PII being exposed to and misused by unauthorized third-party hackers;

c. The untimely and inadequate notification of the data breach;

d. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach; and

e. Ascertainable losses in the form of deprivation of the value of their PHI/PII, for which there is a well-established national and international market.

f. Ascertainable loses in the form of Plaintiff's and Class Members' lost benefit of the bargains.

247. Plaintiff and Class Members conferred a monetary benefit on Defendant by providing their PII/PHI to their healthcare providers. Defendant collected and received that PII/PHI through its regular business activities and aggregated, transferred and sued it for financial and pecuniary benefit.

248. Defendant appreciated that a monetary benefit was being conferred upon it by Plaintiff and Class Members and accepted that monetary benefit.

249. However, Defendant's acceptance of that benefit under the facts and circumstances—in particular, Defendant's failure to implement reasonable data security safeguards, including proper vetting of its third party agents and vendors,

along with its failure to disclose that failure—outlined above was unjust. In doing so, Defendant enriched itself by saving the costs it reasonably should have expended to ensure such reasonable and adequate data security safeguards for the patient PII/PHI it was entrusted. In other words, Defendant chose to increase its own profits at the expense of Plaintiff and Class Members by choosing to implement cheaper, non-effective data security measures.

250. Under the principles of equity and good conscience, it is inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and Class Members without payment of the value thereof. If Plaintiff and Class Members knew that Defendant would not secure their PII/PHI, they would not have agreed to provide it to their healthcare providers to provide to Defendant.

251. Plaintiff and Class Members, as a direct and proximate cause of Defendant's wrongful actions and inactions, have been damages and have suffered the injuries outline above. Plaintiffs and Class Members thus seek the disgorgement of Defendant's proceeds that it unjustly received from them.

## H. CLASS ACTION ALLEGATIONS

252. Plaintiff brings this claim on their own behalf and pursuant to the Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff intend to seek certification of the following Class, initially defined as follows:

> All persons residing in the United States of America who received a data breach notice informing them that their

PHI/PII had been breached by unauthorized third parties as a result of Arietis Health LLC's data breach.

253. Excluded from each of the above Class is Defendant, including any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the judge and the court personnel in this case and any members of their immediate families. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

254. *Numerosity*, Fed. R. Civ. P. 23(a)(1): The members of the Class are so numerous that the joinder of all members is impractical. Presently, Plaintiffs are aware of at least 1,975,066 potential Class Members. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, such as reservation receipts and confirmations.

255. *Commonality*, Fed. R. Civ. P. 23(a)(2) and (b)(3): There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PHI/PII—including *inter alia*, properly vetting the data security of its third party agents and vendors prior to providing them access to patient PII/PHI;

b. Whether Defendant violated common and statutory law by failing to implement reasonable security procedures and practices;

c. Which security procedures and which data-breach notification procedure should Defendant be required to implement as part of any injunctive relief ordered by the Court;

d. Whether Defendant knew or should have known of the security breach prior to the disclosure;

e. Whether Defendant complied with any implied contractual obligation to use reasonable security measures;

f. Whether Defendant's acts and omissions described herein give rise to a claim of negligence;

g. Whether Defendant knew or should have known of the security breach prior to its disclosure;

h. Whether Defendant had a duty to promptly notify Plaintiffs and Class Members that their PHI/PII was, or potentially could be, compromised;

i. What security measures, if any, must be implemented by Defendant to comply with its duties under state and federal law;

j. The nature of the relief, including equitable relief, to which Plaintiffs and the Class Members are entitled; and

k. Whether Plaintiffs and the Class Members are entitled to damages, civil penalties, and/or injunctive relief.

256. *Typicality*. Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because Plaintiff's PHI/PII, like that of every other Class Member, was misused and/or disclosed by Defendant.

257. *Adequacy of Representation*, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff has retained competent counsel experienced in litigation of class actions, including consumer and data breach class actions, and Plaintiffs intend to prosecute this action vigorously. Plaintiff's claims are typical of the claims of Class Members and Plaintiff have the same non-conflicting interests as the other Class Members. Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and their counsel.

258. *Superiority of Class Action*, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class Members is impracticable. Furthermore, the

adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

259. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go un-remedied.

260. Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2), because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

261. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all Class Members, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

1. For an Order certifying the Class as defined herein and appointing Plaintiffs and their Counsel to represent the Class;

2. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PHI/PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

3. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity to Class Members the type of PHI/PII compromised.

4. For an award of damages, including actual and compensatory damages, in an amount to be determined at trial;

5. For an award of punitive and treble damages, in an amount to be determined at trial;

6. For an award of costs of suit, litigation expenses and attorneys' fees, as

allowable by law; and

7. For such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial for all claims so triable.

Respectfully Submitted,

*/s/ Kevin L. Lewis*

Kevin L. Lewis, Esq.
Florida Bar Number: 101124

KL Law
*Counsel for Plaintiff*
150 South Pine Island Road, Suite 300
Plantation, Florida 33324
Telephone: (954) 551-2295
Primary Email: service@kevinlewislaw.com
Secondary Email: kl@kevinlewislaw.com

*/s/ Thiago M. Coelho*

Thiago M. Coelho, Esq.*
**pro hac vice forthcoming*

Wilshire Law Firm, PLC
*Counsel for Plaintiff*
3055 Wilshire Boulevard, 12th Floor
Los Angeles, California 90010
Telephone: (213) 381-9988
Primary Email: thiago@wilshirelawfirm.com
Secondary Email: teamthiago@wilshirelawfirm.com